## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Eugene Allan, Deborah F. Allan, Keith Landen, Matthew J. Cavendish, and Traci Cavendish, on behalf of themselves and others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | ) ) ) | Case No. |
| Realcomp II, Ltd., a Michigan Profit Corporation; The Dearborn Board of Realtors, a Michigan Domestic Nonprofit Corporation; Detroit Association of Realtors, a Michigan Domestic Nonprofit Corporation; Eastern Thumb Association of Realtors, a Michigan Domestic Nonprofit Corporation; Livingston Association of Realtors, a Michigan Domestic Nonprofit Corporation; Metropolitan Consolidated Association of Realtors, a Michigan Domestic Nonprofit Corporation; North Oakland County Board of Realtors, a Michigan Domestic Nonprofit Corporation; Western Wayne Oakland County Association of Realtors, a Michigan Domestic Nonprofit Corporation; Preview Properties, Inc., a Michigan Domestic Profit Corporation; Weir, Manuel, Snyder & Ranke, LLC, a Michigan Domestic Limited Liability Company; Real Estate One, Inc., a Michigan Domestic Profit Corporation; Darralyn C. Bowers, and Individual; Richard Knezek, an Individual; Alissa Nead, an Individual; Douglas Hardy, an Individual; Thomas R. Rademacher, an Individual; and Daniel V. Mulvihill, an Individual. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Hon. Magistrate Judge |
| Defendants. | ) ) ) ) | |

A civil action between other parties arising out of some of the transactions or occurrences alleged in the complaint has been previously filed in this Court, where it was given docket number 07-cv-12090 and was assigned to Hon. Stephen J. Murphy, III. The action is still pending, with a jury trial currently scheduled for November 2010. That case is entitled *Home Quarters Real Estate Group, LLC v. Michigan Data Exchange, Inc., d/b/a MiRealSource and Realcomp II, Ltd.*

## INTRODUCTION

Eugene Allan, Deborah F. Allan, Keith Landen, Matthew J. Cavendish, and Traci Cavendish ("Plaintiffs"), on behalf of themselves and other purchasers of real estate brokerage services for real estate listed for sale by member brokers and agents of defendant ("Realcomp") and the defendant shareholder realtor boards and associations on Realcomp's Multi Listing Service ("MLS"), bring this action to obtain relief for defendants' violation of the Sherman Act. Realcomp, through its Board of Governors, shareholder realtor boards and associations, and its individual members, unlawfully restrained competition among real estate brokerages in Southeastern Michigan, including the counties of Wayne, Oakland, Macomb, and Livingston (the "Southeastern Michigan MLS Service Area"), by enacting and enforcing unlawful Realcomp MLS rules, policies, and procedures that caused Plaintiffs and the other class members to pay higher prices for real estate brokerage services (i.e., real estate brokerage commissions and any other fees charged) than they would have paid absent defendants' illegal conduct.

## PARTIES

1.      Eugene Allan and Deborah F. Allan ("Plaintiffs"), are a married couple who are citizens and residents of Michigan, residing in Hartland Township in Livingston County.  During the class period, Plaintiffs purchased real estate brokerage services from Nancy Bohlen (then Broker-Owner of Preview Properties, Inc., 130 W. Grand River Ave., Brighton, Michigan) in connection with the sale of their home at 792 Oakridge, Brighton, Michigan for $222,000 on or

about July 15, 2005.  Plaintiffs paid a commission of $15,540.00 (7.0%) for those real estate

brokerage services, less a $500 commission concession to PreviewProperties.com.  As a result of

defendants' violations of the Sherman Act, Plaintiffs paid more for real estate brokerage services

than they would have paid had Realcomp, its Board of Governors, its shareholders, and its

members not illegally restrained competition in the Southeastern Michigan MLS Service Area by

developing, implementing, and facilitating unlawful Realcomp MLS rules, policies, and

procedures.

        2.      Keith Landen ("Plaintiff") was married to Amy Landen on June 29, 2004, and

they were citizens and residents of Michigan, residing in Bloomfield Township, Michigan in

Oakland County.  Mr. Landen is still a citizen and resident of Bloomfield Township, Michigan.

During the class period, Plaintiff Landen and his wife purchased real estate brokerage services

from Julie R. Flynn of Defendant Weir, Manuel, Snyder & Ranke, L.L.C. in connection with the

sale of their home at 2880 Lanergan, Troy, Michigan for $289,000 on or about June 29, 2004.

Plaintiff Landen and his wife paid a commission of $17,340.00 (6.0%) for those real estate

brokerage services.  As a result of defendants' violations of the Sherman Act, Plaintiff Landen

and his wife paid more for real estate brokerage services than they would have paid had

Realcomp, its Board of Governors, its shareholders, and its members not illegally restrained

competition in the Southeastern Michigan MLS Service Area by developing, implementing, and

facilitating unlawful Realcomp MLS rules, policies, and procedures.

        3.      Matthew J. Cavendish, D.D.S. and Traci Cavendish ("Plaintiffs") are a married

couple who were citizens and residents of Michigan in 2005, and are currently residing in

Scottsdale, Arizona.  During the class period, Plaintiffs Matthew J. Cavendish and Traci

Cavendish purchased real estate brokerage services from John Huyck of Max Broock Realtors,

275 Old Woodward, Birmingham, MI 48009 (an assumed name of Defendant Real Estate One, Inc.) in connection with the sale of their home at 16933 Kinross, Beverly Hills, Michigan for $250,000 on or about October 31, 2005.  Plaintiffs paid a commission of $15,000.00 (6.0%) for those real estate brokerage services.  As a result of defendants' violations of the Sherman Act, Plaintiffs paid more for real estate brokerage services than they would have paid had Realcomp, its Board of Governors, its shareholders, and its members not illegally restrained competition in the Southeastern Michigan MLS Service Area by developing, implementing, and facilitating unlawful Realcomp MLS rules, policies, and procedures.

4.      Defendant Realcomp is a Michigan Domestic Profit Corporation organized, existing, and doing business under and by virtue of the laws of the State of Michigan, with its office and principal place of business at 28555 Orchard Lake Road, Suite 200, Farmington Hills, Michigan 48334.  Realcomp's Resident Agent and Chief Executive Officer is Karen Kage. Realcomp is owned by several shareholder realtor boards and associations, each of which is composed of competing realtor members in the Southeastern Michigan MLS Service Area. Realcomp's business and affairs are conducted by its Board of Governors, whose members are selected by the shareholder boards and associations. The large majority of residential real estate brokerage professionals in the Southeastern Michigan MLS Service Area are members of Realcomp, which has the largest MLS in Michigan.

5.      Realcomp's primary member service is its MLS, which is a closed database system accessible only to member brokers and, in a more limited form, to the general public through data feeds to various public websites.  MLS listings include information about the property for sale, the type of listing agreement, a description of the services provided by the listing broker, and an offer to compensation to any broker who procures a buyer for the property.

The MLS enhances information sharing among members and provides enforceable rules governing the sale of listed properties.

6.      Defendant Dearborn Board of Realtors (a/k/a Dearborn Area Board of Realtors) is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 2350 Monroe Ave., Dearborn, MI 48124.  Its Resident Agent is Dana R. Holben.  During the class period, the Dearborn Board of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

7.      Defendant Detroit Association of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 2111 Woodward Ave., Suite 509, Detroit, MI  48201.  Its Resident Agent is Sharon A. Armour.  During the class period, the Detroit Association of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

8.      Defendant Eastern Thumb Association of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 2443 10th Ave., Port Huron, MI 48060-2804.  Its Resident Agent is John P. Cooper.  During the class period, the Eastern Thumb Association of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

9.      Defendant Livingston Association of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 5380 Grand River, Howell, MI 48843.  Its Resident Agent is Meghan Webber.  During the class period, the Livingston Association of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

10.     Defendant Metropolitan Consolidated Association of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 2125 Butterfield Rd., Suite 100, Troy, MI 48084.  Its Resident Agent is Stephen T. Tschirhart.  During the class period, the Metropolitan Consolidated Association of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

11.     Defendant North Oakland County Board of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 4400 West Walton Blvd., Waterford, MI  48329.  Its Resident Agent is Patricia A. Jacob.  During the class period, the North Oakland County Board of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

12.     Defendant Western Wayne Oakland County Association of Realtors is a Michigan Domestic Nonprofit Corporation with its office and principal place of business at 24125 Drake Rd., Farmington, MI  48024.  Its Resident Agent is Dale E. Smith.  During the class period, the Western Wayne Oakland County Association of Realtors was a Realcomp shareholder whose members selected its representatives on Realcomp's Board of Governors.

13.     Defendant Preview Properties, Inc. ("Preview Properties") is a Michigan Domestic Profit Corporation with its office and principal place of business at 130 West Grand River, Brighton, MI  48116.  Its Resident Agent is Scott Bohlen.  Preview Properties' website identifies it as belonging to Realcomp' MLS

(http://www.previewproperties.com/ourcompany_aboutus.cfm).

14.     Defendant Weir, Manuel, Snyder & Ranke, LLC ("Weir Manuel") is a Michigan Domestic Limited Liability Company with its office and principal place of business at 298 South Old Woodward, Birmingham, MI 48009.  The Registered Agent for Weir Manuel is Keith M.

6

Sweeney, who testified on behalf of Realcomp before an administrative law judge in the FTC proceedings. Robert E. Taylor of Weir Manuel was selected by Defendant Metropolitan Consolidated Association of Realtors to represent it on Realcomp's Board of Governors in 2005 and 2006, and as an Alternate Governor in 2007.   An August 22, 2010 article on Weir Manuel's website (http://www.weirmanuel.com/images/wm905.htm) reminds its brokers on how to search for lists of addresses for mailings, using Realcomp Online. Weir Manuel brokers listed properties through Realcomp's MLS during the class period.

15.      Defendant Real Estate One, Inc. ("Real Estate One") is a Michigan Domestic Profit Corporation with its office and principal place of business at 25800 Northwestern Highway, Southfield, MI 48025.    Its Resident Agent is Ellen M. Tickner. Real Estate One transacts business under the assumed name of Max Broock Realtors, among others. Defendant Dan Mulvihill of Real Estate One – Brighton was selected by the Livingston Association of Realtors to serve on Realcomp's Board of Governors in 2006 and 2007 (and in 2005 while employed by Re/Max All Stars before it merged with Real Estate One), serving as Realcomp's Treasurer in 2005-2006 and its Vice-President in 2007. Paul Ryder, Jr. of Real Estate One – Detroit was selected by the Detroit Association of Realtors as an alternate representative on Realcomp's Board of Governors in 2005-2006. Real Estate One brokers listed properties through Realcomp's MLS during the class period.

16.      Defendant Darralyn C. Bowers, of Bowers & Associates real estate brokerage (located at 17277 West 10 Mile Rd., Southfield, MI 48075), is a citizen and resident of Southfield, Michigan, where she is domiciled. During the class period, Ms. Bowers served on Realcomp's Board of Governors on behalf of Defendant Detroit Association of Realtors and was an Executive Committee Officer (Secretary).

17.     Defendant Richard H. Knezek, of Remerica Country Place (located at 28555 Orchard Lake Rd. Ste. 200, Farmington Hills, MI 48334-2974), is a citizen and resident of Dearborn, Michigan, where he is domiciled. During the class period, Mr. Knezek served on Realcomp's Board of Governors on behalf of Defendant Dearborn Board of Realtors and was an Executive Committee Officer (President).

18.     Defendant Alissa K. Nead, of Coldwell Banker Preferred – Plymouth (located at 44644 Ann Arbor Rd., Plymouth, MI 48170), is a citizen and resident of Canton, Michigan, where she is domiciled. During the class period, Ms. Nead served on Realcomp's Board of Governors on behalf of Defendant Western Wayne Oakland County Association of Realtors and was an Executive Committee Officer (Secretary).

19.     Defendant Douglas Hardy, of Century 21 Today (located at 28544 Orchard Lake Rd., Farmington Hills, MI 48334), is a citizen and resident of Bloomfield Hills, Michigan, where he is domiciled. During the class period, Mr. Hardy served on Realcomp's Board of Governors on behalf of Defendant North Oakland County Board of Realtors and was an Executive Committee Officer (Treasurer and Vice-President).

20.     Defendant Thomas R. Rademacher, of Keller Williams (located at 1005 E. Grand River Ave., Brighton, MI 48116), is a citizen and resident of Brighton, Michigan, where he is domiciled. During the class period, Mr. Rademacher served on Realcomp's Board of Governors on behalf of Defendant Livingston Association of Realtors and was an Executive Committee Officer (President).

21.     Defendant Daniel V. Mulvihill, of Real Estate One (located at 8685 West Grand River Ave., Brighton, MI 48116), is a citizen and resident of Brighton, Michigan, where he is domiciled. During the class period, Mr. Mulvihill served on Realcomp's Board of Governors on

behalf of Defendant Livingston Association of Realtors and was an Executive Committee Officer (Treasurer and Vice-President).

**INVOLVED NON-PARTIES**

22.     Nancy Bohlen is a citizen and resident of Brighton, Michigan, where she is domiciled. During the class period, Ms. Bohlen was the realtor-broker-owner of Defendant Preview Property, Inc. (a/k/a Preview Properties.com) and a member of the Board of the Livingston Association of Realtors. Ms. Bohlen was the real estate broker who entered into a listing agreement with Plaintiffs Eugene Allan and Deborah F. Allan, and listed their home for sale in Realcomp's MLS.

23.     John Huyck is a citizen and resident of Troy, Michigan, where he is domiciled. During the class period, Mr. Huyck was a realtor and a licensed real estate salesperson for Max Broock Realtor (an assumed name of Defendant Real Estate One, Inc.). Mr. Huyck was the real estate broker who entered into a listing agreement with Plaintiffs Matthew J. Cavendish and Traci Cavendish, and listed their home for sale in Realcomp's MLS.

24.     Julie R. Flynn is a citizen and resident of Beverly Hills, Michigan, where she is domiciled. During the class period, Ms. Flynn was a realtor and licensed real estate salesperson for Defendant Weir, Manuel, Snyder & Ranke, LLC. Ms. Flynn entered into a listing agreement with Plaintiff Keith Landen and Amy Landen, and listed their home for sale in Realcomp's MLS.

***IN THE MATTER OF REALCOMP II, LTD.***

25.     On October 10, 2006, the Federal Trade Commission ("FTC") filed a complaint against Realcomp, alleging that some Realcomp policies limited access to non-traditional property listings by its member brokers and the general public and violated Section I of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 5 of the Federal Trade Commission Act, 15

U.S.C. § 45.  *In the Matter of Realcomp II, Ltd.* (Docket No. 9320).[1]

26.     The FTC announced the filing of its complaint against Realcomp in an October

12, 2006 press release.  http://www.ftc.gov/opa/2006/10/realestatesweep.shtm.

27.     On October 30, 2009, a unanimous FTC (a) reversed the decision of an

administrative law judge,[2] (b) found "that the practices at issue improperly limit[ed] consumers'

access to information about the availability of these lower-priced alternatives" to traditional

listing agreements,[3] (c) "conclude[d] that the association's acts and practices unreasonably

---

[1] At the same time, the FTC issued similar complaints against 6 other MLS's: (a) MiRealSource, Inc. of Michigan (Dkt. No. 9321), (b) Information and Real Estate Services, LLC of Colorado (FTC File No. 061-0087), (c) Northern New England Real Estate Network, Inc. of New Hampshire (FTC File No. 051-0065), (d) Williamsburg Area Association of Realtors, Inc. of Virginia (FTC File No. 061-0268), (e) Realtors Association of Northeast Wisconsin, Inc. (FTC File No. 061-0267), and (f) Monmouth County Association of Realtors of New Jersey (FTC File No. 051-0217).  Five respondents modified their anticompetitive policies and immediately entered into consent orders, while MiRealSource modified its exclusionary policies and entered into a consent order that was approved on March 20, 2007.
  Previously, the FTC had issued a similar complaint against the Austin Board of Realtors (FTC File No. 051-0219), and obtained a consent order that was approved on August 29, 2006 after the MLS changed its anticompetitive policies.
  Subsequently, the FTC has made similar complaints against Multiple Listing Service, Inc. of Wisconsin (FTC File No. 061-0090) and West-Penn Multi-List, Inc. (FTC File No. 081-0167). Each MLS entered into a similar consent order after changing its anticompetitive policies.
  Realcomp was the only MLS that did not enter into a similar consent order with the FTC.
[2] On December 10, 2007, after a two-week trial and post-hearing briefing, Chief Administrative Law Judge Stephen J. McGuire issued an Initial Decision and found that even though Realcomp had market power in the relevant markets, its Website Policy, Search Function Policy, and Minimum Service Requirement did not violate Section 5 of the FTC Act, and he dismissed the complaint. http://www.ftc.gov/os/adjpro/d9320/071210initialdecisiontextversion.pdf.  Certain factual and legal findings in that decision, Realcomp's failure to cross-appeal many of them, and the FTC's analysis of them on appeal are discussed below.
[3] As discussed in more detail below, the FTC found that the combined effect of Realcomp's three anti-competitive policies was to limit exposure of discount listings to both member brokers seeking homes to present to potential buyers and to consumers searching public websites for homes to purchase in the Southeastern Michigan MLS Service Area.  The FTC determined that those policies limited competition, artificially stabilized the price of real estate brokerage services, and deterred innovation and the emergence of new brokerage business models.  The FTC held that those policies were "unreasonable restraints on trade" that were "not justified by countervailing procompetitive considerations."

restrain[ed] trade in violation of  Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Section

5 of the Federal Trade Commission Act, 15 U.S.C. § 45," and (d) entered a cease and desist

order.[4]

28.     Realcomp's appeal is pending before the Sixth Circuit Court of Appeals in

*Realcomp II, Ltd. v. Federal Trade Commission* (Case No. 09-4596).

<h2 style="text-align:center">JURISDICTION AND VENUE</h2>

29.     Realcomp's acts or omissions, and those of its Board of Governors, shareholders,

officers, and members, occurred in Southeastern Michigan, particularly in the counties of

Wayne, Oakland, Macomb, and Livingston ("Southeastern Michigan MLS Service Area").

30.     Because this matter arises under the Sherman Act, 15 U.S.C. § 1, *et seq.*, this

Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

31.     This Court has personal jurisdiction over Realcomp and its shareholders and

officers because properties sold by Plaintiffs and the class members are located within this

judicial district; their causes of action accrued within this judicial district; and Realcomp, its

shareholders, and the other defendants do business within this judicial district.

32.     Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(b), because the

offices and principal places of doing business of Realcomp, its shareholders, and the other

defendants are in this judicial district, most of Realcomp's members are located in Realcomp's

MLS Service Area within this judicial district, and all of those members have a substantial

presence in Realcomp's MLS Service Area, including offices and staff.  Moreover, all real estate

---

[4] The FTC decision is found at http://www.ftc.gov/os/adjpro/d9320/091102realcompopinion.pdf,
the Final Order is located at http://www.ftc.gov/os/adjpro/d9320/091102realcomporder.pdf, and
a related Joint Stipulation is at http://www.ftc.gov/os/adjpro/d9320/091102realcompjointstip.pdf.

transactions forming the basis of this complaint occurred in this judicial district and most, if not all, of the class members reside in this judicial district.

<u>**FACTUAL ALLEGATIONS**</u>

**A.**     <u>**Real Estate Brokers:**</u>

33.     Real estate brokers are licensed real estate professionals who represent either home buyers or home sellers, and who are authorized to engage in the sale of real estate and provide services in conjunction with the sale. More than 80 percent of homeowners hire a real estate broker to assist with some or all tasks associated with the typical real estate transaction. A residential real estate transaction usually involves two brokers: (a) "listing brokers" whom home sellers retain and; (b) "cooperating brokers" who assist home buyers.

**B.**     <u>**Listing Agreements:**</u>

**1.**     <u>**In General:**</u>

34.     To have homes listed in an MLS, home sellers must enter into contracts with MLS member listing brokers called "listing agreements." Listing agreements define the relationship between listing brokers and home sellers, and usually specify the duration of the contracts and the compensation to be paid to listing brokers.

35.     Listing agreements also typically include unilateral offers of compensation to cooperating brokers who procure buyers for the homes.

36.     Listing agreements use different ways to pay listing brokers. Some agreements specify a commission based on a percentage of the home's selling price to be paid at closing. Others provide a flat fee paid at the time the listing agreement is signed. Still others use a combination of these methods.

37.     Most broker compensation arrangements in Realcomp's Service Area are commission-based. Full-service listing brokers in Realcomp's service area typically charge commission rates of about six percent or more of a home's sales price. Offers of compensation to cooperating brokers commonly require listing brokers to share commissions with cooperating brokers. Although home sellers are usually responsible for paying brokerage commissions, home buyers bear part of those costs to the extent that the sale prices of the homes incorporate all or part of the commissions.

### 2.     Exclusive Right to Sell Listing Agreements ("ERTS"):

38.     Exclusive Right to Sell ("ERTS") listing agreements require home sellers to appoint real estate brokers as the sellers' exclusive agents for a designated time to sell the property on the sellers' stated terms. Sellers agree to pay commissions to listing brokers when the properties are sold, whether the sales occur through the efforts of listing brokers, owners, or other brokers, or even if buyers independently approach sellers.  Listing brokers ordinarily pay cooperating brokers, as provided for in the listings.   Such offers of compensation are unconditional, other than requiring cooperating brokers to find buyers. Commissions for listing brokers are bundled with commissions for cooperating brokers in traditional ERTS listing agreements.

39.     Brokers offering ERTS listings typically provide a full set of real estate brokerage services which are "bundled" in the sense that sellers must purchase the entire package.  Sellers cannot customize such listing agreements to pick and choose among offered services.

40.     Brokers offering ERTS listings are sometimes referred to as "full service brokers" and their listings were sometimes referred to as "full service listings," particularly during the

13

2004-2007 time period (discussed below) when Realcomp brokers were required to offer a bundled set of services in their listing agreements in order for those listings to be ERTS listings.

### 3.   Exclusive Agency Listing Agreements ("EA"):

41.    Under Exclusive Agency ("EA") listing agreements, listing brokers also act as the sellers' exclusive agents and list the sellers' home in the MLS, but sellers reserve the right to sell the property without further help from listing brokers.   EA listing agreements are an alternative to ERTS listing agreements.

42.    EA listing agreements call for initial, nonrefundable payments to listing brokers, who, as MLS members, pay dues and fees that support the MLS.

43.    Under an EA listing agreement, sellers owe listing brokers nothing more when the home is sold, and sellers need not pay for the services of cooperating brokers when unrepresented buyers purchase the property without the assistance of such brokers. However, EA sellers must pay cooperating brokers who procure buyers for their homes.

44.    Brokers who offer EA contracts often provide unbundled menus of brokerage services from which home sellers may choose, thereby meeting consumer demand for lower cost brokerage services for consumers who are willing to perform certain home selling tasks themselves that brokers would otherwise perform.

45.    EA listings and other unbundled services offered by limited service brokers provide consumers low-cost alternatives to traditional brokerage services.

46.    A variant of ERTS listings – flat-fee ERTS listings – resemble EA listings in some respects. Flat-fee ERTS listings compensate listing brokers with fixed fees, and not commissions based on a percentage of the selling price. The fees for listing brokers set in flat fee ERTS agreements are usually higher than fees established in EA listings.

47.    Home sales involving EA or flat-fee ERTS agreements require sellers to pay commissions only if cooperating brokers find the buyers who purchase the homes. No additional commissions or compensation are due to listing brokers under EA or flat-fee ERTS agreements.

48.    Brokers offering EA listings are sometimes referred to as "limited service brokers" and their listings are sometimes referred to as "limited service listings."

**C.    Multiple Listing Services:**

49.    An MLS is an information sharing service that provides data about homes listed for sale by its member brokers within a geographic area. MLS listings contain details about a property's features, offers of compensation to a cooperating broker, the number of days the property has been on the market, and other information concerning the purchase and sale of homes.  By centralizing this information, the MLS makes the marketplace for homes more efficient and orderly.

50.    Creation of the MLS was one of the most significant competitive developments in the real estate industry, as it is the most effective marketing tool and is much more important than other methods of promoting the sale of residential real estate.  An MLS dramatically increases the marketing reach of listing brokers by exposing listings to all other MLS members, thereby benefitting listing and cooperating brokers, home sellers, and home buyers.

51.    An MLS is an example of a two-sided market with network effects.  The MLS product is a "platform" for which there are two types of users, each of which regards the platform as more desirable if it succeeds in attracting the other category of users. "Network effects" are present when a product's value to a purchaser depends on the number of other users. The value of an MLS increases as the number of properties listed on the MLS grows.

52.     In addition to operating a closed database for its members, an MLS usually sends listing information to websites that the public can search, such as (a) Realtor.com of the National Association of Realtors ("NAR"), (b) websites operated by the local MLS association itself, and (c) member broker and agent websites, known as Internet Data Exchange ("IDX") websites.

53.     Using IDX feeds, broker websites can display listing information from their local MLS database, thereby allowing consumers to visit the broker's website and search for properties listed for sale by all participating MLS members.

54.     Not all listing information available in the MLS is provided in its feeds to public websites, such as the type of listing agreement or offers of compensation.

**D.    Realcomp's Members:**

55.     Realcomp is composed of horizontal competitors, who compete with one another to provide residential brokerage services to customers in the Southeastern Michigan area.

56.     Most Realcomp members are full service brokers and their agents, though Realcomp has permitted brokers offering discount services to become Realcomp members.

57.     All Realcomp members, including limited service brokers and agents, paid and pay the same dues and fees to Realcomp for basic services, including the ability to list properties in Realcomp's MLS and review the listings of other Realcomp brokers.

**E.    Realcomp's MLS:**

58.     Realcomp's MLS is a cooperative arrangement established and funded by member brokers for their mutual benefit, and serves as a vehicle for member brokers to obtain information about properties listed in its Southeastern Michigan service area.

59.     During oral arguments before the FTC, Realcomp admitted that its MLS was a "horizontal agreement among competitors" who "are also working cooperatively together in the MLS context."

60.     In order to have their homes listed in Realcomp's MLS, sellers had to enter into listing agreements with Realcomp member brokers that include unilateral offers of compensation to Realcomp cooperating brokers who procure buyers for the listed properties.

61.     The Realcomp MLS online system allows member brokers access to the Realcomp MLS from any computer with Internet access.

62.     A key benefit of the Realcomp MLS is access to Internet advertising on "Approved Websites," including (a) Realcomp's MoveInMichigan.com, (b) IDX participant websites, and (c) Realtor.com.  Realcomp MLS listings also appear on ClickOnDetroit.com, a public website operated by WDIV-TV (a Detroit television station) which "frames" and takes its data exclusively from MoveInMichigan.com.

63.     Realcomp has emphasized the importance of its data feeds in selling residential properties, including its feeds to Realtor.com, MoveInMichigan.com, and, through MoveInMichigan.com, ClickonDetroit.com.

64.     In its feeds to Approved Websites, Realcomp does not identify the types of listing agreement in place between the seller and the listing brokers, and, as a result, such information is not displayed to potential home buyers viewing Realcomp's MLS listings on the Approved Websites.

65.     Offers of compensation to cooperating brokers made through Realcomp's MLS are also not displayed on public websites, including the Approved Websites.

66.     The Internet is the leading source of information to consumers when buying or selling a home, since most home buyers and sellers want to be able to search for homes on the Internet before engaging in a transaction.

67.     Realtors benefit from having their listings shown on Realcomp's Approved Websites, sellers benefit from the additional exposure their listings gain, and many Realcomp members advertise their ability to market homes on the Internet to potential home sellers.

68.     At the request of its broker members, Realcomp began offering members the option of providing IDX feeds of MLS listing information to public real estate websites.

69.     Most Realcomp members authorized their listing data to be included in the IDX feed, and most broker websites contain searchable property listings that include information about other brokers' listings from IDX feeds.

70.     No other MLS in Southeastern Michigan provides the geographic reach or membership size of Realcomp, and Realcomp's MLS had and has the largest number of members and listings of any MLS in Michigan.  Thus, in order to most effectively market homes in Realcomp's Service Area, it is critical to have the listings of those homes be accessible to Realcomp brokers through Realcomp's MLS, and to have information about them accessible to the public through the Approved Websites.

71.     Since only Realcomp member brokers have access to Realcomp's MLS, prospective buyers who are not Realcomp brokers cannot directly access information from Realcomp's MLS about houses for sale.

**F.     The Relevant Product and Geographic Markets:**

72.     There are two relevant product markets in this case.

73.     The first product market is an "output market" that consists of the supply of

residential real estate brokerage services, in which Realcomp's broker members compete.

74.     The second relevant product market consists of MLS services.  Realcomp is a participant in this market, and its MLS is a vital input into the supply of residential real estate brokerage services.

75.     The relevant geographic market for both product markets is local, and consists of the counties of Wayne, Oakland, Macomb, and Livingston in Southeastern Michigan.

76.     During the FTC proceedings, an administrative law judge found the above to be the relevant product and geographic markets for purposes of analysis, Realcomp did not cross-appeal that finding to the full FTC, and the FTC agreed with the administrative law judge's findings.

## G.     **Market Power:**

77.     In the FTC proceedings, the administrative law judge also determined that, within that relevant market, Realcomp enjoyed market shares that courts traditionally have relied upon to infer the presence of market power.

78.     He "also found that high barriers to entry protected Realcomp's market position," and that "MiRealSource" (another MLS) was "not an effective substitute for Realcomp."

79.     The administrative law judge also found that Realcomp's market position was "reinforced by 'network effects' inherent in the cooperative nature of an MLS," where "[t]he value or quality of the service to each MLS user rises as the number of other users of the MLS service increases."

80.     For those reasons, the administrative law judge concluded that Realcomp had "'substantial market power' in the relevant market for multiple listing services," including "throughout the four Michigan counties of Wayne, Oakland, Livingston, and Macomb."

81.   Realcomp did not cross-appeal that finding to the full Commission.

82.   In proceedings following complaint counsel's appeal to the full Commission, Realcomp did not contest the finding that it had substantial market power in the relevant markets.

83.   In fact, during oral argument before the FTC, Realcomp's counsel "conceded that it possesse[d] market power in the relevant market."

**H.   Competitive Pressure from Limited Service Brokers:**

84.   Real estate brokers compete with each other to obtain listings and to represent home buyers.

85.   Brokers offering limited services and brokers offering traditional full services compete with one another for new listings.

86.   Limited service brokers are a fairly new and increasingly important form of competition in the real estate industry.

87.   Brokers offering unbundled services (*e.g.*, limited service brokers such as those using EA listing agreements) provide a low cost alternative to consumers of residential real estate brokerage services and thereby put "price pressure" on full service brokerage commissions.

88.   During oral argument to the full FTC, Realcomp's counsel conceded that Realcomp did not cross-appeal the finding of the administrative law judge that "the EA listings 'put price pressure on traditional broker commissions.'"

89.   The limited brokerage service model allows home sellers to buy a subset of the full range of brokerage services while supplying other services by themselves.

90.   Limited service brokers compete not only by unbundling listing services, but also by unbundling the commission structure.

91.     Sellers using a limited service broker can save significantly on the price of a commission by selling their homes to buyers not represented by cooperating brokers.

92.     Limited service brokerages grew from about 2% nationwide market share in 2003 to about a 15% share in 2005.

**I.      Realcomp's MLS Policies:**

93.     Beginning in June 2001, Realcomp, through its elected Board of Governors and officers, responded to the entry of limited service brokers in its service area by adopting a set of policies that limited the exposure of certain discount listing data available through its MLS and its feeds to the Approved Websites.

94.     Those policies were adopted by the Board of Governors selected by the members of the shareholder defendants after counsel advised Realcomp that an outright ban of EA listings would be legally problematic.

95.     During oral arguments before the FTC in April 2008, Realcomp's counsel acknowledged that beginning in 2001, Realcomp's Board of Governors asked lawyers "on multiple occasions about whether they could ban discount realtors or discount listings from the MLS," and that the Board chose to "penalize" discount brokers by discriminating against EA listings after those lawyers advised them that completely banning discount brokers and EA listings from the MLS would be "in violation of antitrust laws."

96.     In April 2004, Realcomp's Chief Executive Officer, Karen Kage, explained in her "Straight Talk" posting on Realcomp's website that Realcomp's MLS accepted EA listings only because (a) the NAR "require[d] MLSs to accept all listing types," and (b) "Realcomp has been advised from more than one legal counsel to accept and include these listings."

97.     After Realcomp adopted and enforced those policies, Realcomp did not provide equivalent services for full service and limited service listings, such as EA listings.

98.     From at least May 1, 2004 through March 2010, Realcomp's Website Policy prevented EA listings from being included in data feeds to public Approved Websites.

99.     From at least May 1, 2004 through April 27, 2007, Realcomp's Search Function Policy excluded EA listings from the default MLS search results obtained by potential cooperating brokers.

100.     From at least May 1, 2004 through April 27, 2007, under Realcomp's Minimum Service Requirement, all member brokers had to provide full service brokerage services in order for their listings to be ERTS listings.

101.     During oral arguments to the FTC, Realcomp's counsel acknowledged that home buying and selling consumers benefitted from EA listings.

102.     On appeal from the initial decision of the administrative law judge, the FTC found that these anti-competitive policies violated the law.

103.     Through these anti-competitive policies, Realcomp members using ERTS listings profited by illegally inhibiting competition from brokers (a) using or desiring to use EA or other discount listings within Realcomp's MLS, and (b) desiring to expose EA and other discount listings to the public through feeds from Realcomp's MLS to the Approved Websites.

104.     Through those policies, Realcomp stabilized at artificially high levels the price paid for real estate brokerage services in the Southeastern Michigan MLS Service Area.

105.     If Realcomp and its Board of Governors, shareholders, and members had not restricted or interfered with the ability of innovative member brokers to publicize EA and other discount listings to other member brokers through Realcomp's MLS, and to expose such listings

to the general public through feeds from Realcomp's MLS to the Approved Websites, EA listings would not have diminished as a percentage of Realcomp's listings as they did after Realcomp's policies were adopted and enforced.

106.     Instead, more EA and other discount listings would have been more easily accessible to member brokers through Realcomp's MLS, and more such listings would have been available to the general public through feeds from Realcomp's MLS to the approved websites.

107.     However, during the class period, Realcomp, through its Board of Governors, shareholders, officers, and members, did not let innovative member brokers fairly compete with traditional member brokers reliant on full-service ERTS listings when they colluded to interfere with the ability of those innovative member brokers to publicize EA and other discount listings to other member brokers through Realcomp's MLS, and to expose such listings to the general public through feeds from Realcomp's MLS to the Approved Websites.

108.     Allowing Realcomp member brokers to fully and fairly publicize EA and other discount listings to other member brokers through Realcomp's MLS, and to expose such listings to the general public through feeds from Realcomp's MLS to the Approved Websites, would have provided those selling homes in Realcomp's Service Area with more competitively-priced options, and, in the process, placed downward pressure on the prices charged by traditional brokers in the Southeastern Michigan MLS Service Area, including those charged by Realcomp's member brokers.

109.     Instead, Realcomp's above policies deprived its innovative member brokers and home sellers in the Southeastern Michigan MLS Service Area of those options and more

competitive pricing, and thereby caused Plaintiffs and other class members to pay artificially inflated, anti-competitive prices.

110.    In proceedings before the FTC, Realcomp stipulated that Realcomp was "a combination of its members with respect to the policies at issue (the 'Web Site Policy" and the 'Search Function Policy')," citing *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978).

111.    Thus, Realcomp's above policies were the result of agreements and concerted action between and among its Board of Governors, officers, the shareholder defendants who selected the Governors, and Realcomp and shareholder members to restrain competition and thereby adversely affect Plaintiffs and the class members.

### 1.    Realcomp's Website Policy:

112.    Realcomp's Board of Governors adopted and approved its Website Policy in 2001, and implemented it in October 2001.

113.    This Website Policy prohibited the distribution of Limited Service, EA, and MLS Entry Only Listings from the Realcomp MLS to, or display on, any Approved Websites.

114.    This Policy also prohibited its member brokers from comingling non-MLS and MLS listings on their own websites.

115.    Prior to the adoption of the Website Policy, Realcomp did not treat EA listings differently from ERTS listings.

116.    Realcomp's decision to exclude EA, Limited Service, and MLS Entry Only listings from Realcomp's Approved Websites through its Website Policy was deliberate.

117.    Realcomp has acknowledged that those "rules state[d] that only exclusive right to sell listings will be distributed to public websites and included in the IDX feed."

118.    After adopting this Policy, Realcomp made certain technical changes, including changing its default data extract program to pull only listings identified as ERTS.

119.    Realcomp began enforcing its Website Policy in 2004 with a range of potential penalties that included fines up to $2,500 per violation, long suspensions from Realcomp's MLS, and expulsion from Realcomp.

120.    Since its founding in 1993, Realcomp and its shareholder owner boards have been affiliated with the National Association of Realtors ("NAR").

121.    Realcomp's bylaws required Realcomp to abide by NAR's rules, and Realcomp incorporated NAR changes into its own rules.

122.    In November 2006, the NAR amended its rules to require an affiliated MLS to "include all current listings," including discount listings, in its IDX feeds.

123.    Realcomp's Board of Governors unsuccessfully tried to persuade the NAR to postpone that rule change, but the NAR rejected that request.

124.    Nonetheless, in April 2007, Realcomp's Board of Governors voted against adopting the NAR's IDX feed policy.[5]

125.    Realcomp's Website Policy remained in place through the FTC's October 30, 2009 Final Order requiring Realcomp to cease and desist from adopting or enforcing any policy, rule, practice or agreement that interfered with the ability of its broker members to enter into EA listings or other forms of nontraditional listings.

126.    After Realcomp's requests to stay that Order regarding its Website Policy were

_____

[5] Interestingly, as of January 19, 2010, the NAR had reportedly contributed about $550,000 towards the $2.4 million spent by Realcomp to defend a policy that discriminates against EA listings by Realcomp / NAR member brokers in violation of the NAR's IDX policy, and the NAR had pledged another $175,000 to help Realcomp appeal the adverse decision by the FTC. https://www.newreach.com/indexContent.jsp?p_article_id=13383.

denied by both the FTC and the Sixth Circuit Court of Appeals, Realcomp eliminated the following language from Section 1.2.4 of the Realcomp II Ltd. Regional MLS Rules and Regulations:  "Listing information downloaded and/or otherwise displayed shall be limited to properties listed on an exclusive right to sell basis."

127.    At the same time, Realcomp also eliminated Section 18.3.7 of those Rules and Regulations, which stated:  "Listing information downloaded and/or otherwise displayed pursuant to IDX shall be limited to properties listed on an exclusive right to sell basis."

## 2.    Realcomp's Search Function Policy:

128.    Realcomp's Board of Governors adopted its Search Function Policy in 2003, amended it in 2004, and kept it in effect until the Board repealed it on April 27, 2007 and its was incorporated into a joint stipulation with the FTC on July 31, 2007.

129.    Before Realcomp implemented that Search Function Policy, the Realcomp MLS search screen defaulted to all available listings, including EA listings.

130.    Realcomp's Search Function Policy excluded discount listings, including EA listings, from the default search results for those who directly accessed the Realcomp MLS.

131.    Under the initial Policy, the default setting on the Realcomp MLS only searched for full service listing and listings identified as "unknown."

132.    Under the amended Policy, the "unknown" category was eliminated and brokers were required to identify the type of listing (e.g., ERTS or EA).

133.    Beginning in May 2004, all Realcomp brokers complied with the amended Search Function Policy.

134.    Before then, Realcomp did not have reliable data on the percentage of EA listings in Realcomp's MLS.

135.   Until the amended Policy was repealed, Realcomp had to either select the "all listings" or the "EA listings" button to see EA listings in Realcomp's MLS, and brokers who did not want to see ERTS listings had to deselect the "ERTS listings" button.

136.   Realcomp's Search Function Policy limited the exposure of EA listings to potential cooperating brokers by suppressing EA listings from Realcomp's MLS default search results.

**3.**   **Realcomp's Minimum Service Requirement:**

137.   In 2004, Realcomp's Board of Governors adopted its Minimum Service Requirement, which, by redefining ERTS listings, compelled member brokers to provide full brokerage services in order to qualify their listings as ERTS listings which could show up in default searches of the MLS database and be disseminated to the Approved Websites.

138.   Those required services included: (a) arranging appointments for cooperating brokers to show listed properties to potential buyers; (b) accepting and presenting offers to purchasers procured by cooperating brokers; (c) advising sellers on the merits of the offers to purchase; (d) assisting sellers with counteroffers; and (e) negotiating on behalf of sellers.

139.   If a home seller was to perform any of those required services, the listing could not be identified as an ERTS listing in Realcomp's MLS per the Minimum Service Requirement.

140.   In conjunction with Realcomp's Search Function Policy, the Minimum Service Requirement excluded all limited service listings from disclosure on the MLS default setting.

141.   When combined with Realcomp's Website Policy, the Minimum Service Requirement prevented brokers without full-service ERTS listings from exposing them to the general public through Realcomp's MLS feeds to the publicly available Approved Websites.

142.   Realcomp's Minimum Service Requirement was eliminated by Realcomp's Board

of Governors on April 27, 2007, and was reflected in a Joint Stipulation Regarding Respondent's Search Function Policy that was entered into with the FTC on July 31, 2007.

### 4. Percentage of EA Listings in Realcomp MLS in 2002-2006:

143.    From mid-2003 to May 2004, broker-identified EA listings rose from 0.0% to about 1.5% of Realcomp MLS listings.

144.    In October 2004, such EA listings peaked at about 1.7% of all Realcomp listings.

145.    Reported EA listings never reached or exceeded 1.0% of all Realcomp MLS listings after early 2005.

146.    By January 2006, reported EA listings reached their nadir, comprising barely 0.4% of all Realcomp listings.

147.    Reported EA listings comprised about or less than 0.5% of all Realcomp listings in November 2005 and January, July, August, and September 2006.

148.    In October 2006, the last month in the time series analysis by the FTC's expert, Dr. Darrell Williams, reported EA listings made up about 0.75% of all Realcomp MLS listings.

149.    The following chart prepared by Dr. Williams shows the percentage of reported EA listings among all those in the Realcomp MLS, as well as the percentage of Realcomp brokers reporting listing types, for the period of January 2002 through October 2006.



The Percent of NON-ERTS Listings in the Realcomp MLS
Decreased Steadily Since Realcomp Began to
Enforce that Brokers Indicate the Listing Type

150.   Thus, from May 2004 (when all brokers began complying with Realcomp's Search Function Policy and Realcomp began enforcing its Website Policy) to October 2006, reported EA listings fell about 50%, from about 1.5% to about 0.75% of all Realcomp listings.

151.   The FTC considered this drop to be "competitively significant," notwithstanding Realcomp's assertion that it was "de minimis."

152.   In finding "that there is sufficient direct proof of actual detrimental effects on competition resulting from Realcomp's restrictive policies," the FTC relied on the above time series analysis, as well as Dr. Williams' benchmark study of other MLSs that found "significantly fewer discount listings in areas where the MLS imposed website restrictions similar to Realcomp's," and his regression analysis controlling for several variables that provided a "clear demonstration of the correlation between restrictive website policies such as Realcomp's and the minimization of EA listings."

29

**J.     The FTC's Findings Regarding Realcomp's MLS Policies:**

153.    As the FTC found:  "The combined effect of Realcomp's three Policies was to limit exposure of EA listings to brokers searching for homes to present to potential buyers, and to consumers searching public websites for homes to purchase."

154.    The FTC held that, when taken together, Realcomp's Policies limited competition among brokerages, artificially stabilized the price of real estate brokerage services, and deterred innovation and the emergence of new brokerage business models.

155.    The F.T.C. determined that Realcomp's Policies were "unreasonable restraints on competition and [were] not justified by countervailing procompetitive considerations."

156.    Thus, the FTC concluded "that the Policies violate[d] Section 1 of the Sherman Act and therefore Section 5 of the FTC Act," and issued "an order enjoining these practices."

**1.     The FTC's Analysis Under the "Inherently Suspect" Framework:**

157.    Applying an "inherently suspect" legal framework,[6] the FTC concluded "that Realcomp's Policies and related requirements [could] reasonably be characterized as 'giv[ing] rise to an intuitively obvious inference of anticompetitive effect.'"

**a.     Realcomp's Policies Were Inherently Suspect:**

158.    The FTC noted that the administrative law judge had found that (a) "Realcomp sent full-service listings, but not exclusive agency listings, to MLS-approved websites; (b) "Realcomp also excluded EA listings from the default results of its internal search function;" and (c) "Realcomp's rules and policies, thus, discriminated against members who offer a product that creates 'price pressure' against the offerings of other members."

---

[6] This refers to the analytical framework that the FTC articulated, and which the Court of Appeals endorsed, in *Polygram Holding, Inc.*, 136 F.T.C. 310 (2003), *aff'd.*, *Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005).

159.    In the FTC's view, those "policies improperly constrain[ed] competition and impede[d] the emergence of a new business model that has considerable benefits for consumers."

160.    The FTC determined that "the full-service real estate brokers who constituted a majority of Realcomp's members perceived the possible expansion of limited service brokerage, in combination with consumers' direct access to MLS listings via Internet websites, to pose extremely serious threats to their traditional business model."

161.    In that setting, the FTC found that "Realcomp adopted the policies at issue in this case, which singled out the new limited-service brokerage business model and put it at a considerable competitive disadvantage, particularly in the context of the increasing competitive importance of certain key Internet websites to disseminate listing information to consumers."

162.    The FTC determined that "[t]hrough the Realcomp Policies, rival real estate firms agreed to limit the advertising of exclusive agency listings and to deny consumers information and service options that such consumers desire."

163.    The FTC found that the "circumstances surrounding the establishment of the policies, and Realcomp's evident aim of retarding the emergence of a new business model, underscore the exclusionary impact of those policies. The policies would have their effect by limiting access to an input – *i.e.* full exposure on the approved websites – necessary for limited service brokers to compete effectively."

164.    Seen in the context in which they arose, those restraints raised "serious competitive concerns" for the FTC, because, "[i]n restricting the ability of the limited-service, lower-cost brokers to have the same level of exposure on the increasingly popular Internet websites as the full-service brokers, it is easy to see how 'an observer with even a rudimentary

understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'"

165. The FTC determined that "Realcomp's policies directly limited the publication and distribution of EA listings and, in effect, operated as a restraint on advertising" that posed "serious dangers to competition and [had] a great capacity to affect prices."

166. The FTC's "examination of the nature of the restriction" led it "to find that the Realcomp Policies create[d] significant competitive hazards."

167. The FTC pointed out that "Realcomp Policies tend[ed] to impose a significant impediment to access to limited service listings by contributing brokers seeking homes on behalf of buyers on the MLS, and by buyers directly seeking homes through public websites.

168. According to the FTC, "Realcomp's Website Policy and related requirements prevented the dissemination of limited service listings by Realcomp on its Approved Websites, whose benefits Realcomp regularly emphasized."

169. The FTC found that those "measures have the further inherent tendency to reduce the 'price pressure' that limited service brokerage has exerted on the full-service brokerage commission structure."

170. "By favoring ERTS listings," the FTC determined that "the Realcomp Policies bolster[ed] those contracts' imposition of a requirement that sellers must pay for a cooperating broker whether one is used or not."

171. The FTC noted that "Realcomp's minimum service requirements then add[ed] to and increase[d] the price floor of ERTS listings by setting a minimum level of brokerage services that the listing broker must offer under ERTS listings."

172.    The FTC added that "Realcomp's Search Function Policy and related requirements prevented default access to limited service listings on its MLS."

173.    According to the FTC, Realcomp's MLS policies were, "in essence, an agreement among horizontal competitors to restrict the availability of information that consumers can use to evaluate the prices and other features of competing providers' offerings, the effect of which is to make such information more difficult and costly to obtain."

174.    "Particularly problematic" to the FTC was the fact that such an "incumbent provider" like Realcomp was "restricting such dissemination of information so as to impede the marketplace participation by relatively new entrants offering low-cost or discounted products or services."

175.    The FTC determined that because "Realcomp's Policies restrict[ed] … the ability of low-cost, limited service brokerages to get their listings included on heavily used public websites, thereby making it more difficult and costly for them to participate fully in the marketplace," they "tend[ed] to alleviate downward pricing pressure on traditional brokers' commission-based pricing model."

176.    As a result, the FTC concluded that Realcomp's above MLS Policies were "inherently suspect and, thus, presumptively unreasonable."

       **b.**    **Realcomp's Proffered Procompetitive Justifications Were Rejected:**

177.    The FTC found without merit and rejected Realcomp's arguments that its MLS Policies were "justified because they eliminate two inefficiencies" that Realcomp claimed arose from EA listings: (a) "free-riding" from home owners who opted to list their homes using EA listings and who then "competed" with cooperating brokers to find buyers for their home; and (b)

a "bidding disadvantage" faced by buyers who used cooperating brokers when bidding against an unrepresented buyer for a home listed under an EA agreement.

178.    The FTC "rejected Realcomp's 'free riding' claim as implausible on its face, and its 'bidding disadvantage' argument as not cognizable under the antitrust laws."

179.    The FTC also stated that Realcomp's asserted justifications for those policies "appear to be post-hoc rationalizations rather than actual reasons for the policies' adoption."

180.    Neither of Realcomp's justifications was mentioned in the resolutions of its Board of Governors adopting any of the three policies.

181.    Realcomp only offered those justifications well <u>after</u> those policies were adopted by its Board.

182.    Realcomp did not assert those justifications until <u>after</u> the FTC issued its complaint against Realcomp.

183.    During their testimony in the FTC matter, Realcomp's Governors incredibly expressed a total lack of knowledge as to why the Board adopted the Website or Search Function policies.

### c.    <u>Realcomp Violated Section 1 of the Sherman Act:</u>

184.    Accordingly, under an "inherently suspect" framework, the FTC concluded "that the Realcomp Policies are unreasonable and in violation of both Section 1 of the Sherman Act and Section 5 of the FTC Act."

### 2.    The FTC's Analysis of Realcomp's MLS Policies Under A Rule of Reason Encompassing Consideration of Market Power and Anticompetitive Effects:

185.    The FTC also found that Realcomp's conceded "market power, coupled with [the FTC's] earlier determination that the tendency of the challenged policies was to suppress

competition, provide[d] 'indirect' evidence that those policies have or likely will have anticompetitive effects."

186.    The FTC further found that there was "sufficient direct proof of actual detrimental effects on competition resulting from Realcomp's restrictive policies," based on a finding that there were "significantly fewer discount listings after the policies at issue were implemented," and that other factors did not cause the share of EA listings to fall.

187.    The FTC again "rejected Realcomp's 'free riding' claim as implausible on its face, and its 'bidding disadvantage' argument as not cognizable under the antitrust laws," thereby finding that "Realcomp has failed to overcome the anticompetitive effects of its Policies with any legitimate, procompetitive justifications."

188.    Thus, under its "fuller rule of reason analysis," the FTC found "ample support in the record for a conclusion that Realcomp's policies [were] anticompetitive."

### 3.    The Factual and Legal Findings of the FTC Were Accurate:

189.    Those factual findings of the administrative law judge regarding Realcomp, its makeup, its policies, and its market power that were adopted by the full FTC were accurate and supported by the record.

190.    Those facts accepted by the full FTC regarding Realcomp, its makeup, its policies, its market power, the anticompetitive effect of Realcomp's policies, and Realcomp's alleged precompetitive justifications were accurate and supported by the record.

191.    The legal conclusions reached by the full FTC regarding Realcomp, its makeup, its policies, its market power, the anticompetitive effect of Realcomp's policies, and Realcomp's alleged precompetitive justifications were accurate and supported by the record.

4.    **The FTC's Final Order:**

192.   On October 30, 2009, the FTC issued its Final Order, consistent with its findings of fact and conclusions of law.

193.   The following are among definitions appearing in Paragraph I of the Final Order: (a) "Realcomp" was identified as Realcomp II, Ltd., and was defined to include, *inter alia*, Realcomp's owners, Board of Directors, directors, officers, shareholders, participants, employees, consultants, agents, and representatives;  and (b) "Owners" was defined as "the current and future Boards and Association of Realtors that are the sole shareholders of Realcomp."

194.   Paragraph II prohibited Realcomp from engaging in behavior that discriminates against nontraditional listings. Realcomp could not, under the Order, treat nontraditional listings in a discriminatory manner. Specifically, Realcomp could not, among other things, (a) prevent its members from offering or accepting EA listings; (b) prevent its members from cooperating with brokers that offer or accept EA listings; or (c) prevent the publication of EA listings on its MLS or public websites to which Realcomp provides data.  Realcomp could, however, adopt policies relating to matters reasonably ancillary to its legitimate objectives, such as the payment of dues and participation requirements.

195.   Paragraph III of the order required Realcomp to amend its rules and regulations to conform to the Order, within 30 days after the date the Order becomes final.

196.   Paragraph IV required Realcomp, within 90 days after the date the Order becomes final, to inform its members of the amendments required under Paragraph III, and to provide each of its members with a copy of the Order. Paragraph IV also required that the Order be

placed on Realcomp's publicly accessible website and to remain accessible for five years from the date it becomes final.

197.    Paragraph VII provided that the Order would remain in effect for a period of ten years.

## K.    Effect on Michigan and Interstate Commerce:

198.    Realcomp, its Board of Governors, its officers, its shareholders, and its members provided real estate brokerage services to customers seeking to buy or sell real estate in Southeastern Michigan, and their illegal activities affected customers selling and purchasing real estate services in that area.

199.    The activities of Realcomp, its Board of Governors, its officers, its shareholders, and its members were in the flow of and had a substantial effect on Michigan and interstate commerce.

200.    In fact, in its November 20, 2006 Answer to the FTC's complaint, Realcomp admitted:

> The acts and practices of Respondent, including the acts and practices alleged herein, have been or are in or affecting commerce as "commerce" is defined in the Federal Trade Commission Act, as amended, and Respondent is subject to the jurisdiction of the Federal Trade Commission. Among other things the aforesaid acts and practices: (A) Affect the purchase and sale of real estate by persons moving into and out of Southeastern Michigan; and (B) Affect the transmission of real estate listing information to public real estate web sites that are intended for a national audience, including Realtor.com.

## CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this lawsuit on behalf of the following class under Rule 23(b)(3) of the Federal Rules of Civil Procedure:  All individuals or businesses that purchased real estate brokerage services in the Realcomp MLS Service Area from May 1, 2004 through April 27, 2007.

202.    Plaintiffs are all class members because they purchased real estate brokerages services during the class period from members of Realcomp and its shareholders, including the listing of their properties through Realcomp's MLS.

203.    Plaintiffs can identify all other class members from Realcomp's own records, the records of Realcomp's shareholders and members, and public records.

204.    Plaintiffs do not know the exact size of the class since this information is in exclusive control of Realcomp and other defendants.  But based upon the nature of the trade and commerce involved, Plaintiffs believe that the class numbers in the tens of thousands and that the class members are dispersed throughout Southeastern Michigan and beyond.  For instance, exhibits cited in the FTC's brief on appeal to the Sixth Circuit Court of Appeals identified sales of homes through Realcomp's MLS constituted 71,801 of 141,089 total sales in Wayne, Oakland, Macomb, and Livingston Counties from November 1, 2004 through October 31, 2006 for an average sale price of just over $200,000.  Therefore, joinder of all class members would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

205.    Plaintiffs' claims are typical of other class members' claims because they were injured through the uniform misconduct of Realcomp, its Board of Governors, its officers, its shareholders, and its members, and paid a supra-competitive price for real estate brokerage services when selling residential property without knowing that those actions were illegal and improper and resulted in higher than necessary commissions.  Accordingly, by proving their own claim, Plaintiffs will necessarily prove the other class members' claims.

206.    Common legal and factual questions predominate within the class, including but not limited to the following:

a.  Whether Defendants conspired to exclude innovative real estate brokers from fully participating in Realcomp MLS by disseminating EA and other limited service listings to other member brokers on an equal basis as ERTS listings, and by making their EA listings available to the general public through Realcomp's MLS feeds to Approved Websites;

b.  The existence and duration of a horizontal agreement by Realcomp's Board of Governors, officers, shareholders, and/or members to exclude innovative real estate brokers from fully participating in Realcomp MLS by disseminating EA and other limited service listings to other member brokers on an equal basis as ERTS listings, and by making their EA listings available to the general public through Realcomp's MLS feeds to Approved Websites;

c.  Whether Realcomp's Board of Governors, officers, shareholders, and/or members implemented their conspiracy to exclude innovative real estate brokers from fully participating in Realcomp MLS by disseminating EA and other limited service listings to other member brokers on an equal basis as ERTS listings, and by making their EA listings available to the general public through Realcomp's MLS feeds to Approved Websites;

d.  Whether the conspiracy of Realcomp's Board of Governors, officers, shareholders, and/or members adversely affected class members by way of eliminating or reducing the downward price pressure on commissions and on the prices paid for other real estate brokerage services, and thereby increasing the prices class members paid for commissions and other real estate brokerage services; and

e.  Whether the conduct of Realcomp's Board of Governors, officers, shareholders, and/or individual and brokerage members caused damages to Plaintiffs and the class members, and if so, the appropriate classwide measure of damages.

207.  Plaintiffs can and will fairly and adequately represent and protect the class members' interests, and they have no interests that conflict with or are antagonistic to those of the class.  Moreover, Plaintiffs' attorneys are experienced and competent in complex, class-action, and antitrust litigation.

208.  Class certification is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because:

a.  Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, economies to

39

the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b.      Each class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

c.      Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

d.      No unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

209.    Throughout the class period, Realcomp affirmatively and fraudulently concealed from Plaintiffs and other class members the illegal nature of its conduct and that of its Board of Governors, officers, shareholders, and members.

210.    Realcomp and its Board of Governors, officers, shareholders, and members attributed the cost of commissions to legitimate market forces, or defended them with false allegedly procompetitive justifications, with the intention of concealing the true nature of their coordination.

211.    Neither Realcomp, nor its Board of Governors, officers, shareholders, or most of its members, told Plaintiffs or other class members that they were fixing the prices of real estate services in Southeastern Michigan by limiting the ability of its member brokers to publicize EA and other discount listings to other brokers through Realcomp's MLS and by excluding EA and other discount listings from Realcomp's feeds to the Approved Websites that could be viewed by the general public.

212.    Accordingly, Plaintiffs and class members could not have even suspected the violations alleged herein at least until the FTC filed its complaint against Realcomp and issued a

related press release on October 12, 2006, because Realcomp and its Board of Governors, officers, shareholders, and members conducted their conspiracy secretly; concealed the nature of their illegal conduct; and fraudulently concealed their activities through various other means and methods.

213.    As an example, Realcomp's Rules & Regulations documenting its above policies, are available online only to those who have a Realcomp user name and password, making it difficult or impossible for Plaintiffs and other class members to learn of those policies.  Thus, members of the general public could not learn of those policies by visiting Realcomp's website prior to the filing of the FTC's complaint on October 10, 2006.

214.    As another example, rather than advising its broker members that the amended Search Function Policy was designed to make it more difficult for member brokers to locate EA listings through default searches of its MLS database, and thereby deter member brokers from entering into EA listings with home sellers, Realcomp's Chief Operating Officer, Karen Kage, merely stated in April 2004 that the mandatory identification of listing types was required to make cooperating brokers "aware of the extent of the services the listing broker will provide to the seller and any potential for cooperating brokers being asked to provide some or all of these services prior to initiating efforts to show or sell the property."

215.    As a result of the fraudulent concealment of Realcomp and its Board of Governors, officers, shareholders, and members, the applicable statute of limitations affecting Plaintiffs and the class members' claims has been tolled.  Plaintiffs and the class members did not discover nor could have suspected through reasonable diligence that defendants were violating the antitrust laws until the FTC filed its complaint against Realcomp on October 10, 2006 and/or issued its October 12, 2006 press release.  Plaintiffs could not have suspected the

existence of this conspiracy at an earlier date by the exercise of reasonable due diligence because of the foregoing deceptive practices and techniques that Realcomp and its Board of Governors, officers, shareholders, and members secretly employed to avoid detection of and affirmatively conceal their antitrust violation.

## LEGAL COUNT
### Violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*

216.    During the class period, Realcomp and its Board of Governors, officers, shareholders, and individual and brokerage members engaged in an illegal contract, combination, or conspiracy — with Realcomp MLS and Realcomp MLS's rules serving as their conduit — to restrain trade or commerce.

217.    In particular, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*, Realcomp and its Board of Governors, officers, shareholders, and members conspired to exclude innovative real estate brokers from fully participating in Realcomp MLS by (a) their disseminating EA and other limited service listings to other member brokers on an equal basis as ERTS listings, and (b) their making their EA listings available to the general public through Realcomp's MLS feeds to Approved Websites.

218.    That conspiracy allowed them to (a) fix, raise, maintain, and stabilize prices of commissions and other real estate brokerage services charged to Plaintiffs and the class members, and (b) caused Plaintiffs and the class members to pay higher prices for commissions and other real estate brokerage services for which they directly contracted with brokerage defendants than they would have paid absent defendants' conspiracy.

219.    In formulating and effectuating their conspiracy, Realcomp and its Board of Governors, officers, shareholders, and members met to discuss excluding, and agreed to exclude, innovative real estate brokerages from fully participating in Realcomp's MLS by (a)

disseminating EA and other limited service listings to other member brokers on an equal basis as ERTS listings, and (b) by making their EA listings available to the general public through Realcomp's MLS feeds to Approved Websites; which agreement and exclusion allowed Realcomp brokers to charge Plaintiffs and the class members supra-competitive prices for real estate brokerage services, as Realcomp and its Board of Governors, officers, shareholders, and members intended.

220.    The conspiracy of Realcomp and its Board of Governors, officers, shareholders, and members had the following adverse effects:

a.    It restrained, suppressed, and eliminated price competition for real estate brokerage services in the Realcomp MLS Service Area;

b.    It raised, fixed, maintained, and stabilized at artificially high levels prices for real estate brokerage services in the Realcomp MLS Service Area;

c.    It deprived free and open market competition to Plaintiffs and the class members for the purchase of real estate brokerage services in the Realcomp MLS Service Area; and

d.    It caused Plaintiffs and the class members to pay more than they otherwise would have paid for real estate brokerage services in the Realcomp MLS Service Area.

221.    The conspiracy of Realcomp and its Board of Governors, officers, shareholders, and members substantially affected trade or commerce in violation of the Sherman Act.

222.    As a direct and proximate result of the above illegal conduct of Realcomp and its Board of Governors, shareholders, officers and members, and in particular the defendants, Plaintiffs and the class members were injured by paying more for real estate brokerage services than they would have paid absent defendants' conspiracy.

## PRAYER FOR RELIEF

Plaintiffs requests the following relief:

A.   That this Court determine this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure and certify Plaintiffs' proposed class;

B.   That this Court find that the conspiracy of Realcomp and its Board of Governors, officers, shareholders, and members violated the Sherman Act;

C.   That this Court enter an order awarding damages to Plaintiffs and the class, and awarding attorneys' fees and costs associated with investigating and prosecuting this action;

D.   That this Court enter an order awarding pre-judgment and post-judgment interest; and

E.   That this Court enter an order awarding treble damages for Plaintiffs and the class members as well as all other relief that this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on their alleged claims.

/s/ Todd R. Mendel
Todd R. Mendel (P55447)
Michael J. Reynolds (P30592)
**BARRIS, SOTT, DENN & DRIKER, P.L.L.C.**
211 West Fort St., 15th Floor
Detroit, MI 48226
Telephone:    (313) 965-9725
Facsimile:    (313) 965-9732
Email:         tmendel@bsdd.com
                mreynolds@bsdd.com

Daniel R. Karon
**GOLDMAN SCARLATO & KARON, P.C.**
700 W. St. Clair Avenue, Suite 204
Cleveland, OH 44113
Telephone:    (216) 622-1851
Facsimile:    (216) 241-8175
Email:         karon@gsk-law.com

Brian D. Penny
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone:     (484) 342-0700
Facsimile:     (484) 342-0701
Email:          penny@gsk-law.com

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF & BLANCHFIELD**
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone:     (651) 287-2100
Facsimile:     (651) 287-2103
Email:          m.reinhardt@rwblawfirm.com
                 g.blanchfield@rwblawfirm.com

Douglas A. Millen
**Freed, Kanner, London & Millen, LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:     224-632-4500
Facsimile:     224-632-4521
Email:          dmillen@fklmlaw.com

*Attorneys for Plaintiffs and the putative class*

Dated:  October 8, 2010

#398072 v.1